Filed 2/2/26  In re A.G. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | B344167 c/w B344789 |
| _____ | (Los Angeles County Super. Ct. No. 21CCJP01718A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| Daniela S. et al., | |
| Defendants and Appellants, | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant Daniela S.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Joshua S.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Daniela S. (Mother) and Joshua S. (Father) appeal from an order terminating their parental rights under Welfare and Institutions Code section 366.26.[1]  Mother contends the juvenile court abused its discretion when it failed to find the beneficial parental relationship exception applied to prevent termination of her parental rights.[2]  (§ 366.26, subd. (c)(1)(B)(i).)  We conclude the juvenile court did not abuse its discretion and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initial Dependency Proceedings Resulting in A.G. Being Placed With Mother*

When these proceedings began in early 2021, Mother was 16 years old, Father was 17 years old, and their daughter, A.G. (born in 2020) was five months old.  The Department received a referral after Father accused Mother of infidelity, grabbed her by her hair, and punched her in the face in front of two-month-old A.G.

The Department filed a section 300 petition, alleging a history of domestic violence between the parents and that Father's violence toward Mother endangered A.G., and that Mother failed to protect A.G. by allowing Father unrestricted access to her.  At the detention hearing in April 2021, the juvenile court ordered A.G. detained from both parents.  After sustaining the section 300 petition as pleaded, in July 2021 the

---

[1]    Statutory references are to the Welfare and Institutions Code.

[2]    Father joins Mother's arguments on appeal and does not advance any separate arguments.  (Cal. Rules of Court, rule 8.200(a)(5).)

court declared A.G. a dependent of the court, removed her from Father's custody, and placed her with Mother on the condition that Mother reside with the maternal grandmother and comply with her case plan.

B.    *A.G. Is Removed from Mother's Custody But Returned Six Months Later*

In September 2021 the juvenile court detained A.G. from Mother and placed her in a foster home after the Department filed a section 387 petition alleging that the parents engaged in a violent altercation in August 2021 and that Mother violated the court's order not to be present during Father's visits.  The court sustained the section 387 petition, removed A.G. from Mother's custody, ordered family reunification services for Mother, and allowed monitored visits.

From November 2021 through February 2022, Mother had "frequent and consistent" visits with A.G. twice a week for two to three hours each visit.  Mother was attentive to A.G.'s needs and came prepared with "food, toys, diapers, and clothes."  The social worker stated Mother and A.G. had a strong bond.  The Department also observed A.G. had a "good bond" with her caregivers and was "thriving in the placement."

In April 2022 the Department liberalized Mother's visits to unmonitored.  By May, the Department reported that Mother remained consistent and prepared during visits and that her bond with A.G. remained strong.  At the six-month review hearing on May 6, 2022, the juvenile court ordered A.G. be returned to Mother's care and set the matter for a section 364 hearing.

C.     *A.G. Is Removed Again and Reunification Services Are Terminated 18 Months Later*

Several months after A.G.'s return to Mother, the Department filed a section 342 petition, alleging Father committed domestic violence in June and August 2022 that endangered A.G., and Mother failed to protect A.G. and violated court orders by allowing Father unrestricted access to her. At the detention hearing in August 2022, the juvenile court again ordered A.G. detained from Mother, with monitored visits for Mother three times per week.

At the October 2022 adjudication hearing, the court sustained both counts of the section 342 petition and ordered A.G. removed from Mother with monitored visitation. A.G. was placed with the maternal grandmother. Between November 2022 and March 2023, Mother visited A.G. 27 times, averaging five to six visits a month. She missed some visits and arrived late to others. Between April and September 2023, Mother visited A.G. fairly consistently. The social worker and babysitter observed Mother and A.G. had a strong bond and Mother was attentive to her.

In July 2023 Mother gave birth to another child, E.S. In February 2024 the Department removed E.S. from Mother due to allegations of general neglect and placed him in a foster home. Between mid-November 2023 and early April 2024, Mother visited A.G. four times, and she missed all visits between December 6, 2023 and March 6, 2024. In February 2024 the maternal grandmother reported Mother's inconsistent visits were negatively affecting A.G.'s behavior. A.G. often cried and exhibited defiant behaviors when Mother did not visit. Although Mother was appropriate and prepared during visits that took place, her bond with A.G. was weakening.

4

In March 2024 the maternal grandmother asked the Department to remove A.G. from her care and place her with E.S. in foster care.  E.S.'s caregiver, Cathy B., was willing to adopt both children.  In April 2024 the juvenile court terminated reunification services for both parents and set the matter for a section 366.26 hearing.

Mother maintained somewhat consistent visitation— one visit in April 2024, five visits in May, six visits in June, and two visits in July 2024.  The Department observed Mother had a loving relationship with minor A.G. but struggled to manage A.G.'s behaviors and needs.

From June through September 2024, Mother's visitation was inconsistent.  Mother visited five times in August and once in September.  Cathy reported that "inconsistency in visitation with [the] parents . . . ha[d] caused [A.G.] [a] lot of confusion and hard feelings.  [Cathy] describe[d] observing child [A.G.] having an increase in fearful behaviors when informed she will be visiting with one of her parents. . . .  It [wa]s challenging when [Mother] indicated she would be visiting with [A.G.] and her brother and then she does not arrive or arrives late.  [Cathy] stated the break down in routine negatively affects child [A.G.]."

By October 2024 A.G. was "thriving" in her placement and had "developed a strong bond and attachment" to Cathy.  She was enrolled in an Early Head Start program and attended therapy.  Cathy reported that A.G. struggled with separation anxiety and nightmares related to her parents' domestic violence.  Mother visited twice in October and four times in November.

As of November 2024, A.G. had become hypersensitive and angry.  She would throw things and hit Cathy, E.S., the family dog, and her therapist.  She had nightmares and was "afraid [Cathy] will leave and men will take her away."  A.G. cried and

5

had tantrums when told that she would be taken for family visits and woke up sad from naps at school.  Her therapist reported she struggled with anxiety and rejection from previous caregivers and had challenges when Mother and Father inconsistently visited, but Cathy was doing an "amazing job" at providing consistency and support.

D.     *The Reports on the Bond Between Mother and A.G.*

In its section 366.26 report, the Department stated Mother "has a bond with [A.G.] and has been consistent in her visitation. . . .  However, [A.G.'s] attachment to her mother continues to display areas of concern due to the recurring separation from [Mother] and inconsistencies in visitation at the beginning of this review period.  [A.G.] recognizes her mother and enjoys her time during visits but continues to be confused about her relationship with her mother.  It is the Department's assessment that with the above factors mentioned, [A.G] does have [a] bond with her mother, but the bond and attachment is rooted in insecurities that have been disruptive to [A.G.]."  Most of Mother and A.G.'s interactions were positive, but A.G. cried when she felt Mother was not paying attention to her or was spending more time with E.S.  Mother tried to give [A.G.] more attention and attempted to soothe and comfort her, but it was "visible that [Mother] becomes overwhelmed when managing [A.G.'s] attention seeking behaviors."

A.G. displayed "an array of emotions and behaviors" when visiting with Mother.  At times, she cried, said she did not want to see Mother, and needed reassurance that she would be returned to Cathy.  Often, however, she would be happy and excited to see Mother.  At the end of visits, A.G. would occasionally cry and say she wanted to go back to Cathy.  Other

6

times, she would hug and kiss Mother and say she wanted to stay, visit, and live with her. The Department opined that her fluctuations in behavior stemmed from her insecure attachment with Mother. A.G.'s therapist agreed that while A.G. wanted to have more time with Mother, "the inconsistency in their family bonding time continued to create insecurities in the attachment [A.G.] has with [Mother]." A.G. referred to Mother as "mom" or "mama" and to Cathy as "mama Cathy." She viewed Mother as a parent but also viewed her maternal grandmother and Cathy as mother figures. During visits, A.G. played and talked to the social worker and strangers as much as she did to Mother.

The Department acknowledged A.G. had a bond with Mother and concluded that A.G. would be affected negatively if A.G.'s relationship with Mother was severed. However, it opined that "[A.G.'s] insecure attachment with [Mother] would be more challenging for [A.G.] to comprehend [than] a complete severing of the relationship." The Department opined that "the length of time that [A.G.] has remained separated from [Mother] has created confusion and insecurities for [A.G.]." A.G. became distressed when she did not see Mother and showed signs of increased anxiety. At four years old, A.G. had been out of Mother's care for most of her life. She had been in Cathy's care for over six months. Cathy was supportive of A.G.'s needs and attended all her medical appointments. The Department assessed that it would be more detrimental to A.G. to be removed from a stable placement than to lose her parents.

In January 2025, when a social worker asked A.G. if she enjoyed visits with Mother, A.G. "nodded her head no." When the social worker asked A.G. where she wanted to live, she responded, "with Mama Cathy" and said she did not want to live with Mother. A.G. was excited to be around Cathy and did not

want to leave her. Cathy observed A.G. seemed more excited to see the maternal grandmother than Mother during visits. Cathy reported that A.G.'s nightmares, tantrums, and occasional hitting increased when Mother began visiting more consistently. However, the social worker believed these behaviors were age appropriate. Cathy reported A.G. was jealous of the parents' "clear preference" for E.S.—A.G. said she wanted to cut her hair like E.S. and have a penis.

Later that month, the foster family agency reported that "[a]lthough [A.G.] arrived with some trepidation and anxiety and challenges are present . . . , [A.G.] has adapted well to her resource home and continues demonstrating an overall positive adjustment to the resource home thus far, including developing a bond and attachment with the resource parent." Cathy was "ensuring [A.G.] receives consistent love and care, including a safe environment, prompt tending to her needs, routine, affection, and frequent interactions." A.G. was comfortable with Cathy and responded positively to her engagement, "such as by smiling, laughing, engaging, and asking questions," and viewed Cathy as a "sense of safety and security." A.G. loved school and "thrived with consistency and predictability." A.G. was upset when she was picked up early for the parents' visits, stating, " 'I don't want to go, I want to stay in school.' "

The foster family agency stated Mother had been "somewhat consistent in her family time participation, with periods of consistency and inconsistency." Mother was generally appropriate, but there were times when she struggled to balance tending to both children. She also had difficulty keeping promises, such as forgetting to bring A.G. birthday and Christmas gifts after promising them. A.G. had trouble sharing with her brother and would become upset, one time hitting

Mother and E.S. until a social worker intervened to help calm A.G. down.  When that happened, A.G. cried and stated, " 'I want mama Cathy.' "

E.     *The Termination of Parental Rights*

At the section 366.36 hearing in February 2025, the court found that Mother visited "somewhat regularly."  The court stated, "[T]he court does not find that the bond has been established . . . to the extent that we would expect it to be in order for the parental bond exception to be met as to Mother.  In any event the court finds any benefit accruing to [A.G]. from her relationship with the parents is outweighed by the physical and emotional benefit she would receive through the permanency and stability of adoption, and adoption would be in her best interest. . . .  [T]here is no exception to adoption in this case."  The court designated Cathy as A.G.'s prospective adoptive parent.

Mother and Father timely appealed.

## DISCUSSION

A.     *Governing Law and Standard of Review*

The purpose of section 366.26 selection and implementation hearings is "to provide stable, permanent homes" for dependent children after the juvenile court has terminated reunification services for the parents.  (§ 366.26, subd. (b).)  "If the court has decided to end parent-child reunification services, the legislative preference is for adoption."  (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["if the child is adoptable . . . adoption is the norm"].) "When the court finds . . . the child is likely to be adopted, the

statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies." (*Elizabeth M.,* at pp. 780-781; see § 366.26, subd. (c)(1)(B); accord, *In re Caden C.* (2021) 11 Cal.5th 631, 630-631 (*Caden C.*).)[3]

One of those six exceptions is the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i).  A parent may avoid termination of parental rights under that exception if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child.  [Citations.]  The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra,* 11 Cal.5th at

---

[3]     Mother argues the Department improperly opposed legal guardianship as the permanent plan for A.G. without explaining why that would be detrimental to her. ~(Mother AOB 40-42)~ However, the Department was not required to provide any justification for its decision not to recommend guardianship as the permanent plan.  " 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)  Adoption is the statutorily preferred permanency plan. (See *Caden C.*, *supra*, 11 Cal.5th at p. 631.)

pp. 629-630; accord, *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.) "[A] parent must prove *all three* components of the beneficial relationship exception," and a "failure of proof on any one of them is fatal." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10.) The exception applies only in " 'exceptional circumstances.' " (*Caden C.*, at p. 631.)

"We review the juvenile court's ruling on the first two elements for substantial evidence. [Citation.] We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068; see *Caden C.*, *supra*, 11 Cal.5th at p. 639.)

B.  *The Juvenile Court Did Not Abuse Its Discretion by Concluding Mother Failed To Establish the Beneficial Parental Relationship Exception*

It appears the court found Mother satisfied the visitation element of the beneficial parental bond exception to adoption. Thus, we focus on the second and third elements of the analysis.[4]

The second element requires that " 'the child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th

---

[4]     The Department argues Mother forfeited her challenge to the second and third elements of the beneficial relationship exception by failing to object to the Department's and the foster family agency's reports. However, Mother objected to the termination of parental rights and argued the parental benefit exception applied. She thus adequately preserved her right to dispute the weight and interpretation of the evidence relevant to this issue.

at p. 632; see § 366.26, subd. (c)(1)(B)(i).) "[P]arents 'must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits.' " (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 816.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, at p. 632.) Substantial evidence supports the court's conclusion that Mother failed to establish this requirement.

Mother argues she and A.G. shared a strong bond and that A.G.'s therapist reported A.G. wanted more time with Mother. While at times A.G. would be excited to see Mother and say she wanted to visit and live with Mother, A.G. showed a mix of emotional and behavioral responses to those visits. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [directing courts to focus on "how children feel about, interact with, look to, or talk about their parents"].) She sometimes cried, said she did not want to see Mother, and needed reassurance that she would be returned to Cathy. Most recently, in January 2025, A.G. said she did not enjoy visits with Mother, wanted to live with Cathy, and did not want to live with Mother. The Department and A.G.'s therapist concluded A.G.'s fluctuating responses to Mother suggested she had an insecure attachment to Mother. (See *id.* at pp. 632-633 [crediting expert psychologists as "an important source of information about the psychological importance of the relationship for the child."]; *In re M.V.* (2025) 109 Cal.App.5th 486, 513 [beneficial relationship exception did not apply where relationship between child and parents "was complicated and sometimes negative"].) Although A.G. viewed Mother as a parent, she viewed several people in her life as maternal figures,

12

including her maternal grandmother and Cathy.  During visits, she engaged equally with Mother, the social worker, and even strangers.  Cathy observed that A.G. seemed more excited to see maternal grandmother than Mother during visits.

Furthermore, by the time of the section 366.26 hearing, four-year-old A.G. had been out of Mother's care for over three years of her life.  The court reasonably concluded Mother failed to show that A.G. would benefit from continuing the relationship.[5]

In evaluating the third element—"whether 'termination would be detrimental to the child due to' the relationship . . .

[5]    Mother argues reversal is required because the juvenile court failed to identify what factors it relied on in determining Mother did not meet the second and third *Caden C.* elements. However, there is no requirement that the court recite specific findings relative to its conclusions regarding the beneficial parental relationship exception.  (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)  Rather, we presume juvenile courts know and apply the correct statutory and case law.  (*Ibid*.)

Mother also contends the court erred by "adopting" minor's counsel's reasoning as to what was in the best interests of A.G. During the hearing, minor's counsel questioned whether Mother would be able to provide A.G. with long-term security and permanence.  Mother claims that in adopting minor's counsel's reasoning, the court relied on improper considerations such as whether Mother could ever care for A.G.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 ["courts should not look to whether the parent can provide a home for the child" in deciding whether beneficial parental relationship exception applies].)  But the record shows the court adopted minor's counsel's reasoning only in finding it was not in A.G.'s best interest to grant Mother's section 388 petition heard simultaneously with the section 366.26 hearing—not in ruling on the beneficial relationship exception.

13

[and] whether it would be harmful to the child to sever the relationship and choose adoption" (*Caden C.*, *supra*, 11 Cal.5th at p. 633)—the court must determine "how the child would be affected by losing the parental relationship" (*ibid.*). The court must determine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship' " with the parent. (*Ibid.*) The juvenile court did not abuse its discretion in determining that any benefit A.G. might receive from continuing contact with Mother was outweighed by the stability and permanency of adoption.

It is true the Department noted A.G. could be negatively affected if her relationship with Mother were severed. But the Department also determined that "[A.G.'s] insecure attachment with [Mother] would be more challenging for [A.G.] to comprehend [than] a complete severing of the relationship." The record contained ample evidence that adoption would provide A.G. with stability, security, and consistent emotional support— benefits the court could reasonably find outweighed the potential harm. A.G. had lived in Cathy's care for over six months, and their relationship was consistently described as loving, stable, and secure. A.G. was "thriving" in Cathy's home and had "developed a strong bond and attachment" to Cathy. Cathy supported A.G.'s emotional, medical, educational, and therapeutic needs. For example, Cathy attended all of A.G.'s medical appointments and ensured she was enrolled in an Early Head Start program and therapy. A.G.'s therapist reported A.G. struggled with anxiety and rejection from prior caregivers, but Cathy was doing "an amazing job" providing stability and support. By contrast, the Department observed that although Mother was attentive and loving, she struggled to manage A.G.'s

14

needs—especially while also caring for E.S.  Viewing the evidence in the light most favorable to the court's order, we conclude it did not abuse its discretion by deciding any harm from terminating A.G.'s relationship with Mother did not outweigh the benefits of obtaining a final, stable, and permanent custody arrangement.

The juvenile court did not abuse its discretion in determining the beneficial parental relationship exception does not apply in this case.  (See § 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 636.)

## DISPOSITION

The juvenile court's order terminating Father's and Mother's parental rights is affirmed.


STONE, J.

We concur:


MARTINEZ, P. J.


FEUER, J.